# EXHIBIT A

Exhibit A - Loan Agreement

**REAL ESTATE LOAN AGREEMENT**

This Real Estate Loan Agreement ("**Agreement**") is dated as of May 27, 2022, and is entered into between LATIGO RENO, LLC, a Delaware limited liability company ("**Borrower**"), and TIG ROMSPEN US MASTER MORTGAGE LP, an exempted Cayman Islands limited partnership ("**Lender**").

Borrower has requested, and, subject to the terms and conditions of this Agreement, Lender has agreed, to extend certain Loan to Borrower.

Borrower and Lender therefore agree as follows:

1.      **Definitions.**

1.1      **Defined Terms**. Except as otherwise provided herein, all capitalized terms used in this Agreement shall have the respective meanings set forth on Schedule I.

1.2      **UCC Terms**. Terms defined in the UCC in effect on the date of this Agreement and not otherwise defined herein shall, unless the context otherwise indicates, have the meanings provided by those definitions. Subject to the foregoing, the term "**UCC**" refers, as of any date of determination, to the Uniform Commercial Code then in effect in the State referenced in Section 11.20.1.

2.      **Loan**.

2.1      **Borrowing and Lending**.

2.1.1      **Advances**. Subject to the terms and conditions of the Loan Documents, including satisfaction of the conditions precedent set forth in Section 5 hereof, Lender agrees to make the Loan to Borrower in multiple advances from time to time until the Maturity Date in a maximum aggregate principal amount not to exceed the Loan Amount. Amounts repaid with respect to the Loan may not be reborrowed. Lender will have no obligation to make more than one (1) disbursement of the Loan each month and each disbursement shall not be less than $75,000. Notwithstanding anything contained herein to the contrary, each advance shall be made in the sole discretion of Lender.

2.1.2      **Use of Proceeds.** Borrower shall use the proceeds of the Loan in accordance with the terms of the Loan Documents, including, without limitation, the Sources and Uses of Funds, and for no other purpose.

2.1.3      **Lender Initiated Advances**. Lender may initiate a disbursement of the Loan for any reason at any time, without Borrower's compliance with any of the conditions of this Agreement, and (a) pay: (i) interest due on the Loan and any points, loan fees, service charges, commitment fees or other fees due to Lender in connection with the Loan; (ii) all title examination, survey, escrow, filing, search, recording and registration fees and charges; (iii) all fees and disbursements of architects, engineers and consultants engaged by Borrower and Lender; (iv) all documentary, stamp and other taxes and charges imposed by law on the issuance or recording of any of the Loan Documents; (v) all appraisal fees; (vi) all title, casualty, liability, payment, performance or other insurance or bond premiums; (vii) all fees and disbursements of legal counsel engaged by Lender in connection with the Loan; or (viii) any other amounts, costs, charges or expenses to protect Lender's interest in Collateral or to perform any of Borrower's obligations under this Agreement , (b) disburse the proceeds directly to third Persons in order to protect Lender's interest in Collateral or to perform any of Borrower's obligations under this Agreement, or (c) apply the proceeds to the amount of any Obligations then due and payable to Lender.

2.1.4    **Disbursement Conditions**.  Lender's obligation to make any disbursement of the Loan shall be subject to the following conditions (in addition to the conditions set forth in Section 5): (a) the Lender has received a Disbursement Request from Borrower, (b) that the representations and warranties described in Section 6 are correct on the date of such disbursement, except to the extent that such representations and warranties relate solely to an earlier date; (c) that no event has occurred and is continuing, or would result from the requested Loan that would result in an Event of Default and (d) Borrower delivers to Lender a title search that shall reflect no liens or encumbrances on the Property (other than the Permitted Liens), and, if required by Lender, an endorsement to the Title Policy acceptable to Lender (each at Borrower's cost).

2.1.5    **Date of Advances**.  With respect to any advance, funds shall be deemed advanced on the date that the funds are removed from the Lender's account and designated to the Borrower's account or as the Borrower may direct.

2.1.6    **Interest Reserve Advances.**  Lender acknowledges and agrees that as of the closing date an unadvanced portion of the Loan equal to $544,024 exists to make payments of accrued interest on the Loan (each, an "**Interest Reserve Advance**").  Provided that no Event of Default then exists, from and after the first Monthly Payment Date following the Interest Advance Milestone Date, interest accrued on the Loan shall be paid from an Interest Reserve Advance when due, without the necessity of any instruction or request from the Borrower.  Borrower shall be responsible for making interest payments from its own funds until such time it becomes entitled to have the Interest Reserve utilized. In the event that the Interest Reserve Advances are exhausted, or is insufficient to pay any amount due herein, the Lender shall so advise the Borrower, and the Borrower shall make such payments from its own funds.  Exhaustion of the Interest Reserve Advances or the inability of the Interest Reserve Advances to fully fund any interest payment shall not release the Borrower from any of Borrower's obligations herein, including but not limited to the obligation to pay interest accruing on the Loan Amount.  No interest shall accrue on the Interest Reserve Advances until actually drawn. **For clarity, no Interest Reserve Advances shall be made until the Interest Advance Milestone Date has been achieved.**

2.2    **Payments and Prepayments**.

2.2.1    **Monthly Payments**. Commencing on the first Monthly Payment Date following the closing of the Loan and on each Monthly Payment Date thereafter, Borrower shall make a payment of accrued interest to Lender in the amount of interest accrued since the previous Monthly Payment Date.

2.2.2    **Payment on Maturity Date**. The Loan will mature on the Maturity Date and Borrower shall pay to Lender on the Maturity Date, the Outstanding Principal Balance, all accrued and unpaid interest, and all other amounts due under the Loan Documents.

2.2.3    **Voluntary Prepayments**. Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part prior to the Maturity Date. Borrower may, at its option and upon not less than 30 days' irrevocable prior written notice to Lender, prepay the Outstanding Principal Balance in full but not part on a Monthly Payment Date and any such prepayment shall be accompanied by (a) all other sums due and payable under the Loan Documents, and (b) all reasonable out-of-pocket costs and expenses incurred by Lender in connection with such prepayment.

2.2.4    **Mandatory Prepayments**. Upon receipt of the proceeds of the sale or other disposition of any Collateral, or if any of the Collateral is damaged, destroyed or taken by condemnation in whole or in part, the proceeds thereof shall be paid by Borrower to Lender as a mandatory

prepayment of the Loan, such payment to be applied against the remaining installments of principal in the inverse order of their maturities until the Loan is repaid in full.

2.2.5    **Payment Method**.  The Borrower agrees to make all regular payments required hereunder via an automatic debit service acceptable to Lender.

2.3    **First Option to Extend**.   Borrower shall have the option to extend the term of the Loan (the "**First Option to Extend**") from November 30, 2022 (the "**First Extension Date**") to May 31, 2023, upon receipt of written notice from Borrower of Borrower's request to exercise the First Option to Extend, which notice shall be provided to Lender not more than 60 days but not less than 30 days prior to the First Extension Date**,** and upon satisfaction of each of the following conditions precedent:

2.3.1    On or before the First Extension Date, no Event of Default shall have occurred and be continuing, and no event or condition which, with the giving of notice or the passage of time or both, would constitute an Event of Default shall have occurred, and Borrower shall so certify in writing;

2.3.2    Concurrently with Borrower's request to exercise the First Option to Extend, Borrower shall have paid to Lender an extension fee equal to one half of one percent (0.50%) of the Outstanding Principal Balance;

2.3.3    On the First Extension Date, the Loan-to-Value Ratio is not more than sixty-seven percent (67%), and the Loan-to-Cost Ratio is not more than seventy percent (70%);

2.3.4    On or before the First Extension Date, Borrower shall have deposited with Lender, into the Tax and Insurance Escrow Fund and Extension Period Debt Service Reserve Account, such amounts as required and calculated by Lender in its reasonable discretion to pay Insurance Premiums, Taxes and interest accruing on the Loan through the extended Maturity Date;

2.3.5    Borrower shall have reasonably adhered to the development plan and budget for development of the Project that were previously submitted to and approved by Lender, as determined by Lender in its reasonable discretion;

2.3.6    Borrower shall have provided evidence, in a form and substance acceptable to Lender in its reasonable discretion, that (i) the Building Permit Application is still in full force and effect and active, (ii) Borrower has reasonably adhered to and achieved the Entitlement Milestones as and when required on Exhibit A hereto and (iii) no Negative Entitlement Event has occurred;

2.3.7    The Hard Contract Condition shall have been satisfied and remain satisfied; and

2.3.8    Borrower shall execute or cause the execution of all documents reasonably required by Lender to exercise the First Option to Extend, and shall deliver to Lender, at Borrower's expense, such title insurance endorsements reasonably required by Lender.

2.4    **Equity Requirements**.  Borrower shall contribute a minimum of $4,890,527 (the "**Equity Requirements**") to the Property, which amount shall be so expended prior to any related disbursement of the Loan.  The amount of the Equity Requirements represented by the Property and any improvements thereon shall be valued at the cost to Borrower of the Property and such improvements, unless otherwise approved by Lender.  Lender shall not be required to accept any portion of the Equity Requirements in a form other than cash, with the exception of the Property and such improvements, if any.

3.    **General Loan Provisions**.

3

3.1    **Interest and Interest Related Matters**.

3.1.1    **Applicable Interest Rate**. Except as otherwise provided in this Agreement, the unpaid principal amount of the Loan shall accrue interest at a fixed rate per annum equal to 10.00% (the "**Interest Rate**").

3.1.2    **Default Interest Rate**. During a Default Period or at any time following the Maturity Date, at Lender's option and without waiving any of its other rights or remedies, the principal amount of the Loan shall bear interest at a rate equal to eight percent (8.0%) plus the otherwise applicable rate set forth in Section 3.1.1 (the "**Default Rate**"), or any lesser rate that Lender may deem appropriate, starting on the first day of the fiscal quarter in which the Default Period begins through the last day of that Default Period.  During any Default Period, all interest accruing on the Loan shall be compounded monthly.

3.1.3    **Usury**. No interest rate shall be effective that would result in a rate greater than the highest rate permitted by law. Payments in the nature of interest and other charges made under any Loan Documents or any other document or agreement described in or related to this Agreement that are later determined to be in excess of the limits imposed by applicable usury law will be deemed to be a payment of principal, and the Obligations shall be reduced by that amount so that such payments will not be deemed usurious. If any provision of this Agreement would oblige the Borrower to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate which would be prohibited by any applicable law or would result in a receipt by that Lender of "interest" at a "criminal rate" (as such terms are construed under the Criminal Code (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable law or so result in a receipt by that Lender of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows:

(i)    first, by reducing the amount or rate of interest required to be paid to the Lender; and

(ii)    thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid to the affected Lender which would constitute interest for purposes of section 347 of the Criminal Code (Canada).

3.1.4    **Calculation of Interest**. Interest shall be calculated on the basis of a three hundred sixty (360)-days-per-year factor applied to the number of actual days elapsed.

3.2    **Fees**.

3.2.1    **Closing Fee**. Borrower shall pay Lender a one-time closing fee of $224,000, which shall be fully earned and payable upon the execution of this Agreement, and (b) an additional amount equal to 2.0% of any portion of the Conditional Earnout Advance Amount actually advanced shall be fully earned and payable upon the advance of such portion of the Conditional Earnout Advance Amount.  Borrower shall also pay to JLL Capital Markets a loan brokerage fee of $112,000.

3.2.2    **Administration Fee; Insurance Review Fee**. Borrower shall pay Lender a one-time administration fee of $1,000, which shall be fully earned and payable upon the execution of this Agreement.  Borrower shall reimburse Lender a one-time insurance risk management cost of up to $1,500, which shall be fully earned and payable upon the execution of this Agreement.

3.2.3    **Advance Fee**. Borrower shall pay to Lender an advance fee of $1,000 on the date of the initial advance and any future advances under this Agreement.

3.2.4 **Other Fees and Charges**. Lender may impose additional fees and charges during a Default Period for (a) waiving an Event of Default; or (b) the administration of any Collateral by Lender. All such fees and charges shall be imposed following oral notice to Borrower on either an hourly, periodic, or flat fee basis, and in lieu of or in addition to imposing interest at the Default Rate.

3.2.5 **Late Fee**. If any sum payable under this Agreement is not paid within five (5) days following the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to five percent (5%) of such unpaid sum in order to defray a portion of the expenses incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. If the day when any payment required under this Agreement is due is not a Business Day, then payment shall be due on the first Business Day thereafter.

3.3 **Costs and Expenses**. Borrower shall pay on demand all costs and expenses, including attorneys' fees, incurred by Lender in connection with the Obligations, this Agreement, any Loan Document or any other document or agreement described in or related to this Agreement, and the transactions contemplated by this Agreement, including all costs, expenses and fees incurred by Lender (a) in connection with the negotiation, preparation, execution, delivery, amendment, and administration of the Loan Documents, (b) to collect any amounts owed to Lender, (c) to enforce the Loan Documents, (d) in connection with the collection, protection, or enforcement of any rights in the Collateral, (e) in any bankruptcy, insolvency, assignment for the benefit of creditors, receivership, or other similar proceeding relating to Borrower or its assets or any Guarantor, (f) in any actual or threatened suit, action, proceeding, or adversary proceeding (including all appeals) by, against, or in any way involving Lender and Borrower or any Guarantor, or in any way arising from this Agreement or Lender's dealings with Borrower, and (g) to retain any payments or transfers of any kind made to Lender by or on account of this Agreement, including the granting of liens, collateral rights, security interests, or payment protection of any type.

3.4 **Payments Generally**. Except as otherwise specifically provided herein, all payments and prepayments under the Loan Documents shall be made to Lender not later than 1:00 P.M. Eastern Time on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office or at such other place as Lender shall from time to time designate, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day. If a Monthly Payment Date or the Maturity Date falls on a day that is not a Business Day, payment shall be made on the next Business Day, and interest shall continue to accrue during that time period. All payments required by the Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

3.5 **Application of Payments and Proceeds**. All payments on the Loan or amounts recovered in connection with the Loan will be applied at any time and from time to time in the following order: (a) the payment or reimbursement of any expenses (including late charges), costs or obligations (other than the principal hereof and interest hereon) for which Borrower shall be obligated or Lender entitled pursuant to the provisions of the Loan Documents, (b) the payment of accrued but unpaid interest, and (c) the payment of all or any portion of the principal balance then outstanding, in either the direct or inverse order of maturity, at Lender's option.

3.6 **Increased Costs**. Borrower shall pay to Lender promptly upon demand, in addition to any other amounts due or to become due hereunder, any and all (a) withholdings, interest equalization taxes, stamp taxes or other taxes (except income and franchise taxes) imposed by any domestic or foreign governmental authority; and (b) amounts necessary to compensate Lender for any change in law that (i) imposes, modifies or deems applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or advances, loans or other credit extended or participated in by, Lender (except any reserve requirement reflected in LIBOR); or (ii) imposes on Lender or the London interbank market any other condition, cost or expense (other than taxes) affecting this Agreement or the Loan.

3.7     **Evidence of Loan and Payments**. The Loan made by Lender shall be evidenced by one or more accounts or records maintained by Lender in the ordinary course of business. The accounts or records maintained by Lender shall be conclusive absent manifest error of the amount of the Loan made by Lender to Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of Borrower hereunder to pay any amount owing with respect to the Loan. Borrower's obligation to repay the Loan shall be evidenced by a promissory note in form and substance reasonably acceptable to Lender (as renewed, amended, substituted or replaced from time to time, the "**Note**").

4.     **Escrows, Reserves and Cash Management**.

4.1     **Tax and Insurance Escrows**.  Lender shall have the right to require the establishment of a tax reserve by Borrower ("**Tax Reserve Right**"). In the event that Lender exercises the Tax Reserve Right, Borrower shall pay to Lender on each Monthly Payment Date (a) one-twelfth of the Taxes that Lender reasonably estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates and (b) one-twelfth of the premiums for the insurance Borrower is required to provide pursuant to this Agreement (the "**Insurance Premiums**") that Lender reasonably estimates will be payable for the renewal of the coverage afforded by the Policies for the succeeding annual period upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (all amounts in clauses (a) and (b) above hereinafter called the "**Tax and Insurance Escrow Fund**"). The Tax and Insurance Escrow Fund and the payments of interest or principal or both, payable pursuant to this Agreement, shall be added together and shall be paid as an aggregate sum by Borrower to Lender in immediately available funds. Lender will apply the Tax and Insurance Escrow Fund to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Section 7.6 and Section 7.8 and under the other Loan Documents provided no Event of Default has occurred and is continuing. In making any payment relating to the Tax and Insurance Escrow Fund, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. Borrower shall arrange for any such bills, statements or estimates to be delivered to Lender at least fifteen (15) Business Days prior to the date any such payment is due. If the amount of the Tax and Insurance Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Section 7.6 and Section 7.8, Lender shall, in its sole discretion, return any excess to Borrower or, at Lender's option, credit such excess against future payments to be made to the Tax and Insurance Escrow Fund. Any amount remaining in the Tax and Insurance Escrow Fund after the Obligations have been paid in full shall be returned to Borrower, or at Lender's option, may be deducted from the Loan payoff amount. If at any time Lender reasonably determines that the Tax and Insurance Escrow Fund is not or will not be sufficient to pay the items set forth in clauses (a) and (b) above, Lender shall notify Borrower of such determination and Borrower shall increase its monthly payments to Lender by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to delinquency of the Taxes and/or thirty (30) days prior to expiration of the Policies, as the case may be. Lender shall not be obligated to pay for Taxes or Insurance Premiums if sufficient funds do not exist in the Tax and Insurance Escrow Fund.

4.2     **Extension Period Debt Service Reserve**.

4.2.1     **Extension Period Debt Service Reserve Generally**.  Amounts in the Extension Period Debt Service Reserve Account are to be used for the purpose of paying, in full, the accrued interest due from Borrower on a Monthly Payment Date in accordance with this Agreement.

4.2.2     **Deposits to the Extension Period Debt Service Reserve Account**.  In connection with any extension of the Maturity Date, Borrower shall deposit with Lender as a deposit to the

Extension Period Debt Service Reserve Account the amounts required by <u>Section 2.3</u> hereof (each, the "**Extension Period Debt Service Reserve Deposit**").

4.2.3    **Disbursements from the Extension Period Debt Service Reserve Account**. Provided no Event of Default exists, Lender shall disburse on such Monthly Payment Date funds from the Extension Period Debt Service Reserve Account and apply such amounts to the required payment of accrued interest.  Borrower acknowledges that Lender has no obligation to disburse more than the remaining balance of the Extension Period Debt Service Reserve Account if such amount is less than the full payment requested.

4.3    **Grant of Security Interest**. As security for the payment and performance of the Obligations, Borrower hereby grants to Lender a continuing security interest in the following property of Borrower, whether now or hereafter owned, existing, acquired or arising and wherever now or hereafter located: the Tax and Insurance Escrow Fund; the Extension Period Debt Service Reserve Account; all other deposit accounts maintained with Lender; all money held in such accounts; any other property of Borrower now or hereafter in the possession, custody or control of Lender, for any purpose; and all additions and accessions to, substitutions for, and replacements, products and proceeds of the foregoing property, including proceeds of all insurance policies insuring the foregoing property (collectively, the "**Reserves**"). Lender will have all rights and remedies available to it under the UCC with respect to the foregoing collateral.

4.4    **Application of Reserves**. Following the occurrence of an Event of Default, Lender may use and apply Reserves or any monies deposited by Borrower with Lender as it determines in its sole discretion, regardless of the purpose for which deposited, including but not limited to cure such Event of Default or to apply as a prepayment of the Loan.

4.5    **Treatment of Reserves**. Borrower shall not earn interest on Reserves held by Lender.

5.    **Conditions to Lending**.

5.1    **Conditions to Initial Loan**. Lender's obligation to make the initial Loan is subject to the condition that Lender shall have received the following, each in a form and substance acceptable to Lender in its discretion:

5.1.1    **Loan Documents**.  This Agreement and each of the Loan Documents, and any document, agreement, or other item described in or related to this Agreement, executed and in form and content satisfactory to Lender;

5.1.2    **Organizational Documents**.  A closing certificate, in form and substance reasonably acceptable to Lender, including resolutions authorizing Borrower to enter into and perform the Loan Documents, an incumbency certificate, and Borrower's organizational documents;

5.1.3    **Opinion**.  An opinion of Borrower's counsel and an opinion of Guarantor's counsel, if applicable, in form, scope and content acceptable to Lender, that, among other things reasonably requested by Lender, confirms the legality, validity and enforceability of the Loan Documents;

5.1.4    **Insurance**.  Evidence of insurance coverage on all Borrower's property, in form, substance, amounts, covering risks and issued by companies satisfactory to Lender, and where required by Lender, with loss payable endorsements in favor of Lender together with a favorable opinion of Lender's insurance consultant on the adequacy of all insurance policies, certificates of insurance, and endorsements;

7

5.1.5    **Appraisal**.  An appraisal, conducted by an appraiser acceptable to Lender, which appraisal must be in form and substance acceptable to Lender, and shall meet Lender's minimum appraisal standards;

5.1.6    **Flood Insurance**.  A flood hazard determination meeting all regulatory requirements and, if applicable, evidence of flood insurance reasonably acceptable to Lender;

5.1.7    **Title Insurance**.  A commitment for an ALTA form of loan policy of title insurance with "gap" coverage (if applicable in the State in which the Property is located) and such endorsements as reasonably required by Lender, issued by the Title Insurance Company, in form and content satisfactory to Lender, to the effect that the Title Insurance Company will issue its loan policy of title insurance in the amount of the Loan (the "**Title Policy**"), insuring that Borrower owns fee simple title to the Property and insuring that the Security Instrument constitutes a first and valid lien on the Property, subject only to encumbrances approved by Lender (and with the deletion of all standard title exceptions with so-called extended coverage). In connection therewith, Borrower shall have executed such owner's affidavits and other affidavits and statements that may be required by the Title Insurance Company to issue the Title Policy in the form required by this Section. The underwriter for which the Title Insurance Company is issuing the Title Policy described above shall have issued a closing protection letter for the benefit of Lender on the customary form issued in the State in which the Property is located insuring the Title Insurance Company's (if the Title Insurance Company is not the underwriter) actions in closing the transactions contemplated by this Agreement;

5.1.8    **Lien Searches**.  UCC searches as deemed necessary or appropriate by Lender, which state there are no liens or encumbrances affecting the Collateral (other than liens and encumbrances acceptable to Lender) or any Guarantor;

5.1.9    **Zoning, Consents, Licenses, Permits and Approvals**.  Borrower shall have furnished to Lender copies of, or other evidence satisfactory to Lender establishing that Borrower has obtained, all consents, licenses, permits and approvals from any and all governmental authorities having jurisdiction over Borrower and/or the Property, which are required in connection with the construction work appropriate for the current state of the Project and/or the execution, delivery and performance by Borrower under, and the validity and enforceability of, the Loan Documents, and all such consents, licenses, permits and approvals shall be in full force and effect.

5.1.10    **Utilities**.  Evidence reasonably satisfactory to Lender that all utility services necessary for the operation of the Property (including sanitary sewer, water, electricity, gas and other similar utilities) are available to and will serve the Property in sufficient capacity for the Property's intended use;

5.1.11    **Environmental**.  A Phase I Environmental Site Assessment prepared by a qualified environmental engineer acceptable to Lender, confirming and certifying to Lender, among other things as requested by Lender, that the Property is free from toxic, hazardous, environmentally regulated, health threatening and safety threatening materials or substances and that the Property complies with all applicable environmental laws, rules and regulations;

5.1.12    **Survey**.  An ALTA survey prepared by a licensed surveyor satisfactory to Lender showing (a) all foundations, improvements, driveways and fences, if any, on the Property; (b) all easements and roads or right of ways and setback lines, if any, affecting the Property; (c) the dimensions, boundaries and square footage of the Property; (d) no encroachments by improvements on the Property or by improvements located on the adjoining property exist; and (e) such additional information that may be required by the Lender;

5.1.13  **Property Condition/Geotechnical Report**.  A written report prepared by a qualified engineer, consultant, or other individual acceptable to Lender showing the Property to be in a condition acceptable to Lender, including a current seismic report, if required by Lender (prepared by a specialist acceptable to Lender);

5.1.14  **Property Management**.  If applicable, a copy of any property management agreement regarding the Property together with a collateral assignment of such agreement, in form and substance acceptable to Lender;

5.1.15  **Equity Requirements**.  Evidence reasonably acceptable to Lender that Borrower has contributed the Equity Requirements to the Property;

5.1.16  **Site Inspection**.  Lender has received an acceptable site inspection of the Property;

5.1.17  **Interview; Income**.  Lender has completed and is satisfied with an interview of Borrower and has reviewed and is satisfied with the present and intended use of the Property and the income to be generated from the Property;

5.1.18  **Property Contracts**.  Lender shall have received, reviewed, and be satisfied with all contracts, including any letters of intent, relating to the Property;

5.1.19  **Budget**.  Lender shall have received and approved a proforma income and expense projection for the proposed improvements and a proposed cost budget to complete the contemplated construction project;

5.1.20  **Design and Entitlement Professional Agreements**.  As applicable, copies of all architect, construction, engineer, and other contracts requested by Lender that are necessary to complete construction of the Project including each Design/Entitlement Contract;

5.1.21  **Design and Entitlement Professional Consents.** To the extent required by Lender, consents of each Design and Entitlement Professional to the Assignment of Contracts together with subordination by each Design and Entitlement Professional of all liens in the Property;

5.1.20  **KYC**.  Lender shall have received evidence and be satisfied of Borrower's compliance with The Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada) and Regulations.

5.1.21  **Fees and Costs**.  Payment of all fees and expenses due under this Agreement; and

5.1.22  **Other Requirements**.  Such other documents or information as Lender may reasonably require.

5.2  **Conditions to Disbursements of Conditional Earnout Advance Amounts**. Notwithstanding anything contained herein to the contrary, the Borrower acknowledges and agrees that a portion of the Loan equal to the Conditional Earnout Advance Amount shall be held back by Lender and not advanced until the conditions set forth in this Section are achieved; provided, however, the Conditional Earnout Advance Amount shall only be advanced prior to the First Extension Date, unless otherwise extended by Lender in Lender's sole discretion.  Lender's obligation to make any disbursements of the portions of the Conditional Earnout Advance Amount set forth below to Borrower, shall be subject to satisfaction of each of the further additional conditions each satisfied in a form and substance reasonably acceptable to Lender in its discretion:

9

      5.2.1    **Conditions Precedent**.  The conditions set forth in Section 5.1 shall have been satisfied;

      5.2.2    **No Default**.  No Event of Default shall exist, and Borrower shall so certify in writing;

      5.2.3    **Additional Advance Fees**.  Payment of all fees and expenses due under this Agreement, including the additional closing fee set forth in Section 3.2.1;

      5.2.4    **Purchase Agreement Requirements**.  Borrower shall have provided evidence, in a form and substance acceptable to Lender in its reasonable discretion, that Borrower has executed an arm's length third party Purchase Agreement with Greystar, or such other qualified purchaser acceptable to Lender in its sole discretion, for the sale of the Property to be developed as student housing rental units (a) at a price which is equal to or greater than $18,000,000 and (b) with at least a $250,000 earnest money deposit ("**EMD Deposit**"), which EMD Deposit has become "hard" and is unconditional and non-refundable to buyer pursuant to the terms of the Purchase Agreement unless and except as a result of a default of the Borrower under the Purchase Agreement (collectively, the "**Hard Contract Condition**");

      5.2.5    **Collateral Assignment of EMD Deposit**.  Lender shall have received a collateral assignment of the EMD Deposit, in a form and substance acceptable to Lender, and acknowledged by the escrow agent where such EMD Deposit is deposited;

      5.2.6    **Minimum LTV**.  The Loan-to-Value Ratio shall be no greater than sixty-five percent (65%) after giving effect to the Conditional Earnout Advance Amount and assuming that Interest Reserve Advances have been fully advanced;

      5.2.7    **Interest Advance Milestone Date**. The Interest Advance Milestone Date has been achieved; and

      5.2.8    **Building Permit; Project Development Status; No Negative Entitlement Event.** Borrower shall have provided evidence, in a form and substance acceptable to Lender in its reasonable discretion, that (i) the Building Permit Application is still in full force and effect and active, (ii) Borrower has reasonably adhered to and achieved the Entitlement Milestones as and when required on <u>Exhibit A</u> hereto and (iii) no Negative Entitlement Event has occurred.

Upon satisfaction of the requirements under this Section 5.2, the Borrower shall be entitled to an additional one-time disbursement on the Loan in the full amount of the Conditional Earnout Advance Amount or such lesser amount thereof in order to comply with the required Loan-to-Value Ratio.

      5.3    **Conditions to All Loan**. Lender's obligation to make any Loan (including the initial Loan) is subject to the further additional conditions: (a) that the representations and warranties described in Section 6 are correct on the date of the Loan, except to the extent that such representations and warranties relate solely to an earlier date or a change in circumstances related to the progress of the development of the Project; (b) if required by Lender, the Borrower shall deliver to Lender, at Borrower's sole expense, a title endorsement to the Title Policy in form and substance satisfactory to Lender insuring the continued lien of the Security Instruments in the same priority that existed on the closing date and (c) that no event has occurred and is continuing, or would result from the requested Loan that would result in an Event of Default.

6.    **Representations and Warranties**. Borrower makes the following representations and warranties to Lender, which representations and warranties shall survive the execution of this Agreement and shall continue in full force and effect until the full and final payment, and satisfaction and discharge, of all obligations of Borrower to Lender subject to this Agreement:

10

6.1 **Organization; Qualification; Power**. Borrower is duly formed and validly existing and in good standing under the laws of the jurisdiction indicated at the beginning of this Agreement and is qualified to do business in all jurisdictions in which the nature of its business makes such qualification necessary and where failure to so qualify would have a material adverse effect on its financial condition or operations. Borrower has the power and authority to execute, deliver, and perform its obligations under this Agreement and the other Loan Documents to which it is or may become a party. Borrower has no subsidiaries.

6.2 **Compliance with Agreements and Laws**. The execution, delivery and performance by Borrower of this Agreement and the other Loan Documents are within Borrower's powers, have been duly authorized by all necessary action, do not contravene (a) Borrower's articles or operating agreements; or (b) any law or any contractual restriction binding on or affecting the Borrower, and do not result in or require the creation of any lien, security interest or other charge or encumbrance (other than pursuant to the terms thereof) upon or with respect to any of its properties. Borrower and the Property are in compliance with all provisions of all Legal Requirements, the breach or default of which could have a material adverse effect on Borrower's financial condition, properties or operations.

6.3 **Approvals**. No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by Borrower of this Agreement and the other Loan Documents, except for such approvals and consents that have been made or obtained.

6.4 **Enforceability**. This Agreement and the other Loan Documents to which Borrower is a party when delivered will be, legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

6.5 **Litigation**. There are no actions, suits or proceedings pending or, to Borrower's knowledge, threatened against or affecting Borrower or any of its Affiliates or the properties of Borrower or any of its Affiliates before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, if determined adversely to Borrower or any of its Affiliates, would have a material adverse effect on the financial condition, properties or operations of Borrower or any of its Affiliates.

6.6 **Financial Statements**. All financial statements, information and other data delivered by Borrower and any Guarantor to Lender are complete and correct in all material respects and disclose all contingent obligations that are material individually or in the aggregate. Such financial statements accurately and fairly represent each applicable party's financial condition and operating results as of such date and since such date there has been no material change in the Borrower's or any Guarantor's financial condition or results of operations sufficient to materially impair the ability to repay the Loan.

6.7 **Material Adverse Effect; Material Adverse Change**. Since the date of the most recent financial statements provided to Lender, there has been no material adverse effect or Material Adverse Change in the financial condition, operations or business of Borrower, any Guarantor, or any portion of the Property.

6.8 **Margin Stock**. (a) No proceeds of the Loan will be used to acquire any security in any transaction that is subject to Sections 13 and 14 of the Securities Exchange Act of 1934; (b) Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System); and (c) no proceeds of the Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

6.9 **Solvency**. As of, from and after the date of this Agreement, Borrower (a) owns and will own assets the fair saleable value of which are (i) greater than the total amount of liabilities (including contingent liabilities); and (ii) greater than the amount that will be required to pay the probable liabilities of its then existing

11

debts as they become absolute and matured considering all financing alternatives and potential asset sales reasonably available to it; (b) has capital that is not unreasonably small in relation to its business as presently conducted or any contemplated or undertaken transaction; and (c) does not intend to incur and does not believe that it will incur debts beyond its ability to pay such debts as they become due.

6.10    **Investment Company**. Borrower is not required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

6.11    **Ownership**. Borrower is, and will remain, the fee simple owner of the Property and the Collateral, free and clear of all liens and encumbrances other than Permitted Liens.

6.12    **Operation of Property**. The present and proposed operation and use of the Property do not violate any applicable law, ordinance, code, rule, regulation, order, or any restrictive covenant or any similar land use restriction binding on the Property.

6.13    **Utilities**. All water, sewer, electric, telephone and drainage facilities and all other utilities required by law and by the normal operation of the Property have been installed to the boundary line of the Property

6.14    **Access**. All roads, easement areas and other modes of ingress and egress necessary for the full utilization of the Property have been completed and Borrower has the legal right to use such roads, easement areas or modes of access.

6.15    **Leases**. No Leases exist with respect to the Property and no tenants are in possession of any portion of the Property other than one residential, month-to-month tenant occupying 470 Highland Ave, Reno, NV (the "**Existing Tenant**").

6.16    **Environmental Matters**. Borrower is in compliance in all material respects with all Environmental Laws. None of the operations of Borrower is the subject of any federal or state investigation evaluating whether any remedial action involving a material expenditure is needed to respond to a release of any toxic or hazardous waste or substance into the environment. Borrower has no material contingent liability in connection with any release of any toxic or hazardous waste or substance into the environment.

6.17    **Separate Tax Lot**. The Property is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting a part of the Property.

6.18    **Flood Zone**. Except as otherwise disclosed on the survey of the Property provided to Lender in connection with the Loan, no portion of the Property is located in an area identified by the Federal Emergency Management Agency or any successor thereto, as an area having special flood hazards.

6.19    **Boundaries**. All of the Property lies wholly within the boundaries and building restriction lines of the Property, and no easements or other encumbrances affecting the Property (including the Permitted Liens) encroach upon any of the Improvements. No improvements on adjacent properties encroach upon the Property.

6.20    **Mechanic Liens**. No mechanics', materialmen's or similar liens or claims have been, or may be, filed for work, labor or materials affecting the Property that are or may be liens prior, equal or subordinate to the Security Instrument.

6.21    **Assessments**. No unpaid assessments for public improvements or assessments otherwise affecting the Property currently exist or, to the best of Borrower's knowledge, are pending, nor are improvements contemplated to the Property that may result in any such assessments.

6.22    **Minimum Entitlements**.  The Property is fully entitled and shall remain entitled in order to construct the Project, including the right for Borrower to build (as a matter of right), under the Mixed Use - University of Nevada Regional Center-Academics and Research zoning designation under the City zoning code a 6 story student housing complex on the Property with not less than (i) 549,832 square feet of building square footage and (ii) 268 student housing rental units containing 901 beds.

7.    **Affirmative Covenants**.

7.1    **Reporting Requirements**. Borrower shall deliver to Lender the following information, compiled where applicable using an Approved Accounting Method, consistently applied, in form and content reasonably acceptable to Lender:

7.1.1    **Annual Financial Statements**. As soon as available and in any event within ninety (90) days after Borrower's fiscal year end, Borrower's annual financial statements, in a form and substance acceptable to Lender, prepared by Borrower and in each case certified as accurate by the Borrower.

7.1.2    **Financial Statements of Guarantor(s)**. As soon as available and in any event within ninety (90) days after each year end, current financial statements of each Guarantor including all of such Guarantor's contingent liabilities.

7.1.3    **Budget**. No later than thirty (30) days prior to each fiscal year end, Borrower's projected balance sheet, income statement and statement of cash flows for each month of the next fiscal year, including all planned capital expenditures in respect of the Property, certified as accurate by Borrower's chief financial or equivalent officer and accompanied by a statement of assumptions and supporting schedules and information.

7.1.4    **Tax Returns of Borrower**. No later than five (5) days after they are required to be filed, copies of Borrower's signed and dated state and federal income tax returns and all related schedules, and copies of any extension requests.

7.1.5    **Tax Returns of Guarantor(s)**. No later than April 30th of each year, or five (5) days after they are required to be filed, whichever is later, signed and dated state and federal income tax returns and related schedules of each Guarantor, and copies of any extension requests.

7.1.6    **Quarterly Progress Reports**.  If requested by Lender, within twenty (20) days after the end of each quarter, Borrower shall provide Lender with progress reports on the status of the development of the Property.

7.1.7    **Development Condition Notices**.  No later than ten days after receiving any material notice or correspondence relating to the Project and/or the Development Conditions, Borrower shall provide Lender with a copy of such notice or correspondence.

7.1.8    **City Approvals**.  Borrower will keep Lender promptly and timely apprised of the status of the Project, including the permits and approvals.  Borrower will direct its development team, including its engineering firm, to copy Lender on all submissions to the City and promptly upon receipt from the City or any other governmental authority, copies of all reports, applications or other notifications relating to the Project.

13

7.1.9 **Greystar Contract Notices**. No later than ten days after receiving any material notice or correspondence relating to the Greystar Contract, Borrower shall provide Lender with a copy of such notice or correspondence.

7.1.10 **Defaults**. No later than three (3) days after learning of the probable occurrence of any Event of Default, a writing notifying Lender of the Event of Default and the steps being taken by Borrower to cure the Event of Default.

7.1.11 **Other Reports**. From time to time, with reasonable promptness, such other materials, reports, records or information as Lender may reasonably request.

7.2 **Use of Proceeds**. Borrower shall use the proceeds of the Loan in accordance with the terms of the Loan Documents, including, without limitation, the Sources and Uses of Funds, and for no other purpose.

7.3 **Books and Records**. Borrower shall maintain and cause each of its subsidiaries to, maintain, proper books of record and account in which full, true, and correct entries in conformity with an Approved Accounting Method shall be made of all dealings and transactions in relation to its business and activities.

7.4 **Compliance with Legal Requirements**. Borrower shall comply, and shall cause the Property to comply, with all Legal Requirements, the non-compliance with which would materially and adversely affect Borrower's business or financial condition.

7.5 **Maintenance of Property**. Borrower shall maintain in good and safe repair, working order and condition all material assets used in the business of Borrower. Borrower shall promptly repair or replace any portion of the Property that may become damaged, worn or dilapidated except Borrower shall have no duty to maintain the current buildings on the Property other than keep them maintained in compliance with all applicable Legal Requirements and otherwise reasonably secured and free of life and safety issues.

7.6 **Insurance**.

7.6.1 Borrower shall comply with the insurance requirements listed on Schedule III attached hereto. If Borrower fails to maintain such insurance, Lender shall have the right, but not the obligation, to obtain such insurance on Borrower's behalf and such costs and expenses incurred by Lender shall be deemed to constitute a portion of the Obligations.

7.6.2 All policies shall be issued by companies approved by Lender with an A or better rating from the A.M. Best Company, Inc., and shall comply in all respects with Lender's insurance requirements; all policies and renewals thereof are hereby assigned to Lender. All policies shall be delivered to and held by Lender. Each policy shall provide that it may not be canceled, non-renewed, or materially amended (including any reduction in the scope or limits of coverage) without at least thirty (30) days' prior direct written notice to Lender from the relevant insurance company. If applicable, the insurance coverage must adequately address loss exposures created by building laws and/or ordinances (building law and ordinance coverage). All renewal policies shall be delivered to Lender, premiums prepaid for a term of at least one (1) year, at least ten (10) days before the expiration of the policies being renewed. Acceptance of policies tendered by Borrower shall not preclude Lender from requiring other or additional insurance against the same or other hazards. All policies of insurance and the coverages and endorsements required hereunder are referred to herein as the "**Policy**" or "**Policies**".

7.6.3    Any failure by Lender to insist on full compliance with all of the above insurance requirements at closing does not constitute a waiver of Lender's right to subsequently require full compliance with these requirements.

7.7    **Leases**.

7.7.1    Borrower shall not enter into any Leases for the Property without the prior, written consent of Lender, which consent may be withheld in Lender's sole and absolute discretion.

7.7.2    On or before August 30, 2022, Borrower shall have caused the Existing Tenant to vacate the Property.

7.8    **Payment of Taxes and Other Lienable Charges**. Borrower shall promptly and fully pay by their due dates all taxes and other assessments now or hereafter assessed or charged against the Property as they become due and payable. Borrower shall promptly cause to be paid and discharged any lien that may be or become a lien against the Property (including mechanics' or materialmen's liens). Borrower shall furnish to Lender, upon request, evidence satisfactory to Lender that all taxes and other assessments have been paid and are not delinquent.

7.9    **Property Manager**. Borrower shall cause the Property Manager to manage the Property in a first-class manner.  Borrower shall not enter into any agreement regarding the management or leasing of the Property without Lender's prior written consent, not to be unreasonably withheld.  Borrower shall cause each Property Manager to execute an assignment and subordination of management fees in a form and substance reasonably acceptable to Lender.

7.10    **Inspection Rights**. At any reasonable time and from time to time, Borrower shall permit Lender or its representatives to (a) examine and make copies of the books and records of Borrower, (b) visit the Property and (c) discuss the affairs, finances and accounts of Borrower with any of its members, partners, officers or directors and any and all visits and inspections deemed necessary or desirable shall be at the Borrower's expense. Lender may, at any reasonable time, enter and visit the Property for the purpose of performing non-disruptive appraisals, observing the Property, taking and removing soil or groundwater samples or the conducting of any other subsurface tests on any part of the Property, including so called Phase I Environmental Site Assessments, provided that if any of the foregoing are invasive, Lender shall be obligated to restore the Property to the same physical condition as existed before such taking, removal or testing.

7.11    **Casualty and Condemnation**.

7.11.1    Borrower shall give Lender prompt written notice of any Casualty and Borrower shall promptly commence and diligently complete the repair and restoration of the Property as nearly as possible to the condition it was in immediately prior to such Casualty (a "**Restoration**"). Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance. Borrower shall have no duty to restore the existing buildings.

7.11.2    Borrower shall give Lender prompt written notice of any actual or threatened Condemnation and deliver to Lender a copy of all papers serviced in connection with such proceedings. If no Default Period exists, Borrower may settle and compromise the Condemnation. If a Default Period exists, Borrower may settle and compromise the Condemnation only with Lender's consent and Lender may participate in any litigation and settlement discussions with respect to the Condemnation.

7.12    **Anti-Terrorism.**

15

7.12.1    Neither Borrower nor any other Person owning a direct or indirect interest in Borrower is in violation of any Legal Requirements, including requirements of The Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada) and Regulations, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (the "**Executive Order**") and the Patriot Act.

7.12.2    None of Borrower, the direct members of Borrower, Guarantors, nor any of their respective constituents, investors or affiliates, any of their respective brokers or other agents, if any, acting or benefiting in any capacity in connection with the Loan is a "**Prohibited Person**" which is defined as follows:

(i)    a Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)    a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)    a Person with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering Legal Requirements, including the Executive Order and the Patriot Act;

(iv)    a Person who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(v)    a Person that is named as a "**specially designated national and blocked person**" on the most current list published by the U.S. Treasury Department Office of Foreign Assets control at its official website, http://www.treas.gov/ofachl 1 sdn.pdf or at any replacement website or other replacement official publication of such list, or other similar lists maintained by the Office of Foreign Assets Control ("**OFAC**"), the Department of the Treasury or included in any Executive Orders; and

(vi)    a Person who is affiliated with a Person listed above.

7.12.3    None of Borrower, the direct members of Borrower, Guarantors or any of their respective affiliates, investors or constituents or any of their respective brokers or other agents, if any, acting in any capacity in connection with the Loan are or will (i) conduct any business or engage in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order; (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purposes of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order or the Patriot Act or (iv) violate any applicable Bank Secrecy Act laws and regulations.

7.12.4    Borrower covenants and agrees to deliver to Lender any certification or other evidence requested from time to time by Lender in its reasonable discretion, confirming compliance with this Section.

7.12.5    (i) None of the funds or other assets of Borrower, any member of Borrower or Guarantors constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person (as defined below); (ii) no Embargoed Person has any interest of any nature whatsoever in Borrower or Guarantor, as applicable (whether directly or indirectly); and (iii) none of the funds of Borrower, any member of Borrower or Guarantors, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower, any member of Borrower or Guarantors, as

16

applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law. "**Embargoed Person**" means any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower, any member of Borrower or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan made by the Lender is in violation of Applicable Law.

7.12.6    Borrower shall comply, and cause each subsidiary to comply, with all applicable Bank Secrecy Act laws and regulations, as amended from time to time and otherwise comply with the Patriot Act and Lender's related policies and procedures.

7.13    **Subdivision Maps**. Prior to recording any final map, plat, parcel map, lot line adjustment or other subdivision map of any kind covering any portion of the Property (collectively, "**Subdivision Map**"), Borrower shall submit such Subdivision Map to Lender for Lender's review and approval, which approval shall not be unreasonably withheld. Within ten (10) Business Days after Lender's receipt of such Subdivision Map, Lender shall provide Borrower written notice if Lender disapproves of said Subdivision Map. Within five (5) Business Days after Lender's request, Borrower shall execute, acknowledge and deliver to Lender such amendments to the Loan Documents as Lender may reasonably require to reflect the change in the legal description of the Property resulting from the recordation of any Subdivision Map. In connection with and promptly after the recordation of any amendment or other modification to the Security Instrument recorded in connection with such amendments, Borrower shall deliver to Lender, at Borrower's sole expense, a title endorsement to the Title Policy in form and substance satisfactory to Lender insuring the continued first priority lien of the Security Instrument. Subject to the execution and delivery by Borrower of any documents required under this Section, Lender shall, if required by any Legal Requirements, sign any Subdivision Map approved by Lender pursuant to this Section.

7.14    **Single-Purpose**.  In order to maintain its status as a separate entity and to avoid any confusion or potential consolidation with any Affiliate, Borrower represents and warrants that in the conduct of its operations since its organization it has and will continue to observe the following covenants: (i) maintain books and records and bank accounts separate from those of any other person or entity; (ii) maintain its assets in such a manner that it is not costly or difficult to segregate, identify or ascertain such assets; (iii) comply with all organizational formalities necessary to maintain its separate existence; (iv) hold itself out to creditors and the public as a legal entity separate and distinct from any other entity; (v) maintain separate financial statements, showing its assets and liabilities separate and apart from those of any other Person and not have its assets listed on any financial statement of any other person or entity, except that Borrower's assets may be included in a consolidated financial statement of its' Affiliate so long as appropriate notation is made on such consolidated financial statements to indicate the separateness of Borrower from such Affiliate and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliate or any other person or entity (except to the extent of the other Borrower's liabilities hereunder); (vi) prepare and file its own tax returns separate from those of any person or entity to the extent required by Applicable Law, and pay any taxes required to be paid by applicable law; (vii) allocate and charge fairly and reasonably any common employee or overhead shared with Affiliates; (viii) not enter into any transaction with any Affiliate, except on an arm's-length basis on terms which are intrinsically fair and no less favorable than would be available for unaffiliated third parties, and pursuant to written, enforceable agreements; (ix) conduct business in its own name, and use separate stationery, invoices and checks bearing its own name; (x) except as required by the Loan Documents, not commingle its assets or funds with those of any other person or entity; (xi) not assume, guarantee or pay the debts or obligations of any other person or entity; (xii) correct any known misunderstanding as to its separate identity; (xiii) not permit any Affiliate to guarantee or pay its obligations (other than limited guarantees and indemnities set forth in the Loan Documents); (xiv) not make loans or advances to any other person or entity; (xv) pay its liabilities and expenses out of and to the extent of its own funds; (xvi) maintain a sufficient number of employees in light of its contemplated business purpose and pay the salaries of its own employees, if any,

17

only from and to the extent of its own funds; and (xvii) cause the managers, officers, employees, agents and other representatives of Borrower to act at all times with respect to Borrower consistently and in furtherance of the foregoing and in the best interests of Borrower; provided, however, that none of the foregoing provisions shall require any equity owner to make additional capital contributions to Borrower.

7.15    **Loan-to-Value Ratio**. Borrower shall maintain, at all times, a Loan-to-Value Ratio of not more than sixty-seven percent (67%).

7.16    **Loan-to-Cost Ratio**. Borrower shall maintain, at all times, a Loan-to-Cost Ratio of not more than seventy percent (70%).

7.17    **Development Conditions**.  Borrower shall comply in all respects with the Development Conditions and promptly perform all required Development Conditions as and when required thereby.  The Borrower shall not permit any approvals for the Project set forth in the Development Conditions to expire, lapse or terminate.

7.18    **Entitlement Milestones**. Borrower shall reasonably adhere to and achieve the Entitlement Milestones as and when required on Exhibit A hereto.  As used in this section to "reasonably adhere to and achieve" shall mean Borrower is not delayed more than thirty (30) days past the dates provided in Exhibit A.

7.18    **Greystar Contract**.

7.18.1   Borrower shall comply in all respects with the Greystar Contract and promptly perform all requirements and obligations under the Greystar Contract. Borrower shall not default under the Greystar Contract.

7.18.2   On or before June 30, 2022, the Borrower shall have delivered to Lender the fully executed Assignment of PSA.

7.19    **Neeser Agreements**.  On or before June 30, 2022, the Borrower shall have delivered to Lender, in a form and substance acceptable to Lender, (a) a fully executed consent of Neeser Construction to the Assignment of Contracts together with subordination by each Neeser Construction of all liens in the Property and (b) an acknowledgement to the assignment of the Design/Entitlement Contract for Neeser Construction to Borrower.

8.    **Negative Covenants**.

8.1    **Indebtedness**. Borrower shall not incur, create, assume or permit to exist any indebtedness or liability on account of deposits or letters of credit issued on Borrower's behalf, or advances or any indebtedness for borrowed money of any kind, whether or not evidenced by an instrument, except: (a) the Obligations; and (b) unsecured indebtedness to trade creditors in the ordinary course of business.

8.2    **Other Liens**. Borrower shall not create or suffer to exist, or permit any of its subsidiaries to create or suffer to exist, any lien, security interest or other charge or encumbrance, or any other type of preferential arrangement, upon or with respect to any of its properties, whether now owned or hereafter acquired, or assign, or permit any of its subsidiaries to assign, any right to receive income, other than Permitted Liens.

8.3    **Fundamental Changes**. Borrower shall not (a) change its state of organization, name or the location of its chief executive office without the prior written consent of the Lender, (b) consolidate with or merge into any other entity, or permit any other entity to merge into it, (c) engage in any line of business

18

materially different from Borrower's business on the date of this Agreement, (d) amend its organizational documents, or (e) acquire all or substantially all of the assets of any other entity.

8.4    **Modifications to Property**.  Except as provided for herein, Borrower shall not, nor shall any other Person, make any modifications or additions to the Property or make or permit any change in the use of the Property, without the prior written consent of Lender, except in conjunction with the development of the Project or demolition of the existing structures on the Property.

8.5    **Limitations on Distributions, Etc**. Except for the distribution of the Conditional Earnout Advance Amount  when available, Borrower shall not distribute any money or other property to any member of Borrower or any Affiliate of Borrower, whether in the form of earnings, income or other proceeds from the Property and Improvements, nor shall Borrower repay any principal or interest on any loan or other advance made to Borrower by any member or any Affiliate of Borrower, nor shall Borrower loan or advance any funds to any such member or any Affiliate of Borrower.

8.6    **Broker Agreements**. Borrower will not enter into any agreement to pay leasing or sales commissions unless such agreement (a) provides that the obligation to pay such commissions will not be enforceable against any party other than the party who entered into such agreement, (b) is subordinate to the Security Instrument, and (c) is not enforceable against Lender. Borrower will deliver copies of each such agreement to Lender together with evidence reasonably satisfactory to Lender that the foregoing conditions have been satisfied.

8.7    **Developer Fees; Payments to Affiliates**.  Borrower shall not pay to any party any developer or development fee or otherwise pay any fees or reimburse costs or expenses incurred by Guarantors or any Affiliate of Borrower.

8.8    **Development Agreements**.  Borrower shall not enter into any development agreement or similar agreement for the development of the Property with the City or any other party of without Lender's prior written consent.

8.9    **Negative Entitlement Event.** The Borrower shall not permit a Negative Entitlement Event to occur.

9.    **Transfers; Death or Incapacity of Guarantor**.

9.1    **Prohibition Against Transfers**. Except for Permitted Transfers, Borrower shall not permit any Transfer to be undertaken or cause any Transfer to occur.

9.2    **Death or Incapacity of Guarantor**.  Within ninety (90) days after the death or incapacity of any Guarantor who is an individual, Borrower shall cause a substitute Guarantor approved by Lender in accordance with this Section 9.2 to deliver to Lender a substitute Guaranty and Environmental Indemnity Agreement in form and substance identical to the Guaranty and Environmental Indemnity Agreement delivered on the closing date and a legal opinion with respect to the enforceability of such Guaranty and Environmental Indemnity Agreement in form and substance similar to the enforceability opinion delivered on the closing date and otherwise satisfactory to Lender.  Lender's approval of a substitute Guarantor shall not be unreasonably withheld provided such substitute Guarantor has a comparable net worth and experience to the Guarantor. Lender's approval hereunder may be subject in Lender's discretion to the receipt of a satisfactory credit report and credit check and other due diligence with respect to the substitute Guarantor.

10.    **Default and Remedies**.

10.1    **Events of Default**. An "**Event of Default**" shall occur if:

10.1.1    Borrower fails to pay any amount of any Obligations on the date that it becomes due and payable;

10.1.2    Any representation or warranty made by Borrower in this Agreement or any other Loan Document is untrue or misleading in any material respect when made;

10.1.3    The Borrower fails to perform or comply with any term or condition contained in Section7.6 or Article 8 (Negative Covenants);

10.1.4    The Borrower fails to perform or comply with any term or condition contained in Section 7.18 titled "Entitlement Milestones "which is not remedied within thirty (30) days after written notice thereof by the Lender to the Borrower;

10.1.5    Borrower or Guarantor fails to perform or observe any other term, covenant or agreement contained in this Agreement or any other Loan Document or fails to perform or observe any other obligation to Lender(other than occurrences described in other provisions of this Section 10.1 for which a different grace or cure period is specified, or for which no cure period is specified and which constitute immediate Events of Default) and such default is not remedied or waived within thirty (30) days after the earlier of (i) receipt by Borrower of notice from Lender of such default or (ii) actual knowledge of Borrower of such default;

10.1.6    Borrower or any Guarantor becomes insolvent or admits in writing an inability to pay debts as they mature, or Borrower or any Guarantor makes an assignment for the benefit of creditors; or Borrower or any Guarantor applies for or consents to the appointment of any receiver, trustee, or similar officer for the benefit of Borrower, or for any of their properties; or any receiver, trustee or similar officer is appointed without the application or consent of Borrower or any Guarantor, as applicable; or any judgment, writ, warrant of attachment or execution or similar process is issued or levied against a substantial part of the property of Borrower or any Guarantor;

10.1.7    Borrower or any Guarantor files a petition under any chapter of the United States Bankruptcy Code or under the laws of any other jurisdiction naming Borrower or any Guarantor as debtor; or any such petition is instituted against Borrower or any Guarantor; or Borrower or any Guarantor institutes (by petition, application, answer, consent or otherwise) any bankruptcy, insolvency, reorganization, debt arrangement, dissolution, liquidation or similar proceeding under the laws of any jurisdiction; or any such proceeding is instituted (by petition, application or otherwise) against Borrower or any Guarantor;

10.1.8    A final, non-appealable arbitration award, judgment, or decree or order for the payment of money in an amount in excess of $100,000 which is not insured or subject to indemnity, is entered against Borrower or Guarantor that is not immediately stayed or appealed together with the filing of a supersedeas bond in the amount of such award, judgment, or decree or order;

10.1.9    Borrower is in default with respect to any bond, debenture, note or other evidence of material indebtedness issued by Borrower that is held by any third Person other than Lender, or under any instrument under which any such evidence of indebtedness has been issued or by which it is governed, or under any material lease or other contract, and the applicable grace period, if any, has expired, regardless of whether such default has been waived by the holder of such indebtedness;

10.1.10 Borrower liquidates, dissolves, terminates or suspends its business operations or otherwise fails to operate its business in the ordinary course, or merges with another Person; or sells or attempts to sell all or substantially all of its assets;

20

10.1.11  Any event or circumstance occurs that Lender in good faith believes may impair the prospect of payment of all or part of the Obligations, or Borrower's ability to perform any of its material obligations under this Agreement or any other Loan Document,

10.1.12 a Material Adverse Change in the financial condition, operations or business of Borrower, any Guarantor, or any portion of the Property;

10.1.13  A change of Control of Borrower occurs;

10.1.14  A Negative Entitlement Event occurs;

10.1.15  Any Guarantor dissolves, repudiates, purports to revoke or fails to perform any obligation under such Guarantor's Guaranty; or

10.1.16  Any Guarantor dies or becomes incapacitated provided that Lender shall not exercise any of its remedies on account of such death or incompetence and shall rescind such Event of Default if within ninety (90) days following such event such Guarantor is replaced pursuant to Section 9.2.

10.2    **Rights and Remedies**. During any Default Period, Lender may in its discretion exercise any or all of the following rights and remedies:

10.2.1    Lender may declare the Obligations to be immediately due and payable and accelerate payment of the Loan, and all Obligations shall immediately become due and payable, without presentment, notice of dishonor, protest or further notice of any kind, all of which Borrower hereby expressly waives; provided that upon the occurrence of an Event of Default described in Section 10.1.6 or 10.1.7, all Obligations shall immediately become due and payable without presentment, demand, protest or notice of any kind;

10.2.2    Lender may, without notice to Borrower, apply any money owing by Lender to Borrower to payment of the Obligations, including any and all balances and deposits of Borrower held by Lender;

10.2.3    Lender may exercise and enforce its rights and remedies under any of the Loan Documents; and

10.2.4    Lender may exercise any other rights and remedies available to it by law or agreement.

10.3    **Intentionally deleted**.

10.4    **No Waiver**. Any failure by Lender to insist upon strict performance by Borrower of any of the provisions of this Agreement or any other Loan Document shall not be deemed to be a waiver of any of the terms or provisions of this Agreement or the other Loan Documents, and Lender shall have the right thereafter to insist upon strict performance by Borrower of any and all of the terms and provisions of this Agreement or any other Loan Document.

10.5    **Rights to Cure Defaults and Protection of Collateral.**  During a Default Period, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any Obligations, make any payment or do any act required of Borrower in the Loan Documents with respect to any Obligations, which payment or action on the part of Lender will be in such manner and to such extent as Lender deems necessary to protect the Collateral. Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose the Security Instrument or to collect the Obligations, and the cost and expense thereof (including

21

attorneys' fees and expenses to the extent permitted by law), with interest as provided in this Section 10.5, will be a Loan (even if the Loan Amount is exceeded) and will be due and payable to Lender upon demand and will be secured by the Collateral. All such costs and expenses incurred by Lender in remedying any Event of Default or in appearing in, defending, or bringing any such action or proceeding will bear interest at the Default Rate, for the period beginning on the first day that such cost or expense was incurred and continuing until the date of payment to Lender. Any payments made by Lender, or costs or expenses incurred by Lender, under this Section 10.5, will correspondingly reduce the available amount of the Loan to the extent that the Loan is not already fully advanced.

11.    **Miscellaneous**.

11.1    **Notices**. Except as otherwise specified herein, any notice, consent, request or other communication required or permitted to be given hereunder shall be in writing, addressed to the other party as set forth below such party's signature to this Agreement (or to such other address or person as either party or person entitled to notice may by notice to the other party specify), and shall be: (a) personally delivered; (b) delivered by Federal Express or other comparable overnight delivery service; or (c) transmitted by United States certified mail, return receipt requested with postage prepaid. Unless otherwise specified, all notices and other communications shall be deemed to have been duly given on the first to occur of actual receipt of the same or: (i) the date of delivery if personally delivered; (ii) one (1) Business Day after depositing the same with the delivery service if by overnight delivery service; and (iii) three (3) days following posting if transmitted by mail.

11.2    **Attorney Fees**. In the event that Lender employs attorney(s) to collect the Obligations, to enforce the provisions of this Agreement or to protect or foreclose the Collateral, Borrower agrees to pay reasonable Lender's attorney fees and disbursements, whether or not suit be brought. Such fees shall be immediately due and payable.

11.3    **Setoff**. Lender may at any time during a Default Period, in its commercially reasonable discretion and without demand or notice to anyone, set off any liability owed to Borrower by Lender against any Obligations, whether or not due.

11.4    **Revival of Obligations**. To the extent that any payment or payments made to Lender under this Agreement are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, to Borrower, whether directly or indirectly as a debtor-in-possession, or to a receiver or any other party under any bankruptcy law, or other state or federal law, then the portion of the Obligations of Borrower intended to have been satisfied by such payment or payments will be revived and will continue in full force and effect as if such payment or payments had never been received by Lender.

11.5    **No Oral Amendments**. This Agreement may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

11.6    **Assignment**. This Agreement, the Loan Documents or the Obligations may be freely transferred and assigned, in whole or in part, by Lender, its successors, endorsees and assigns. Borrower may not transfer its rights and obligations with respect to this Agreement, the Loan Documents, or the Obligations.

11.7    **Joint and Several Liability**. If Borrower consists of more than one person or entity, the obligations and liabilities of each such person or entity shall be joint and several.

11.8    **Release**. Borrower does hereby release, remise, acquit and forever discharge Lender and Lender's employees, agents, representatives, consultants, attorneys, fiduciaries, servants, officers, directors, partners, predecessors, successors and assigns, subsidiary corporations, parent corporation, and related

22

corporate divisions (all of the foregoing hereinafter called the "**Released Parties**"), from any and all action and causes of action, judgments, executions, suits, debts, claims, demands, liabilities, obligations, damages and expenses of any and every character, known or unknown, direct and/or indirect, at law or in equity, of whatsoever kind or nature, whether heretofore or hereafter arising, for or because of any matter or things done, omitted or suffered to be done by any of the Released Parties prior to and including the date of execution hereof, and in any way directly or indirectly arising out of or in any way connected to this Agreement or any of the other Loan Documents (all of the foregoing hereinafter called the "**Released Matters**"). Borrower acknowledges that the agreements in this paragraph are intended to be in full satisfaction of all or any alleged injuries or damages arising in connection with the Released Matters. Borrower represents and warrants to Lender that it has not purported to transfer, assign or otherwise convey any right, title or interest of Borrower in any Released Matter to any other Person and that the foregoing constitutes a full and complete release of all Released Matters.

11.9    **Indemnification**. In addition to its obligation to pay Lender's expenses under the terms of this Agreement, Borrower shall indemnify, defend and hold harmless Lender, and any of its affiliates and successors, and all of their present and future officers, directors, employees, attorneys and agents (each an "**Indemnitee**") from and against any of the following (collectively, "**Indemnified Liabilities**"): (a) any and all transfer taxes, documentary taxes, assessments or charges made by any governmental authority by reason of the execution and delivery of the Loan Documents, or any other document or agreement described in or related to this Agreement or the making of the Loan; (b) any claims, loss or damage to which any Indemnitee may be subjected if any representation or warranty contained in this Agreement proves to be incorrect in any respect or as a result of any violation of the covenants contained in Section 7.12; and (c) any and all other liabilities, losses, damages, penalties, judgments, suits, claims, costs and expenses of any kind or nature whatsoever (including the fees and disbursements of counsel) in connection with this Agreement and any other investigative, administrative or judicial proceedings, whether or not such Indemnitee shall be designated a party to such proceedings, that may be imposed on, incurred by or asserted against any such Indemnitee, in any manner related to or arising out of or in connection with the making of the Loan and the Loan Documents, or any other document or agreement described in or related to this Agreement, or the use or intended use of the proceeds of the Loan, with the exception of any Indemnified Liability caused by the gross negligence or willful misconduct of an Indemnitee. If any investigative, judicial or administrative proceeding described in this Section is brought against any Indemnitee, upon the Indemnitee's request, Borrower, or counsel designated by Borrower and satisfactory to the Indemnitee, will resist and defend the action, suit or proceeding to the extent and in the manner directed by the Indemnitee, at Borrower's sole cost and expense. Each Indemnitee will use its best efforts to cooperate in the defense of any such action, suit or proceeding. If this agreement to indemnify is held to be unenforceable because it violates any law or public policy, Borrower shall nevertheless make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities to the extent permissible under applicable law. Borrower's obligations under this Section shall survive the termination of this Agreement and the discharge of Borrower's other obligations under this Agreement.

11.10    **Severability**. If any term, covenant or condition of this Agreement is held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such provision.

11.11    **Patriot Act Notice**. Lender hereby notifies Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies Borrower and any additional borrowers and guarantors under the Loan together with Borrower's chief executive officer and chief financial officer, which information includes Borrower's and their name, address, tax identification number and other information that will allow Lender to identify Borrower and such other parties in accordance with the Patriot Act.

11.12    **Counterparts; Effectiveness**. This Agreement and any amendments, waivers, consents or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which, when so executed and delivered, shall be deemed an original, but all of which

counterparts together shall constitute but one agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart signature page.

11.13    **Tax Withholding**.  Borrower shall deliver to Lender any necessary documentation to obtain reduced or no withholding tax as portfolio interest under the Code or any applicable income tax treaty, including Lender providing IRS Form W-8BEN to Borrower. Under the United States — Canada Income Tax Treaty as in effect on the date of this Agreement, Lender and Borrower agree that there is currently no withholding required on the interest for the Loan. In order for the interest to qualify as portfolio interest, the Note shall be in registered form as to both principal and interest. In addition, the Note may be assigned or transferred only by the Lender, and Borrower must either reissue the Note to the new holder or issue a new note to the new holder, if so required by Lender or Lender's assignee.

11.14    **Advertising**. Borrower hereby agrees Lender (together with its Affiliates, "**Romspen**") may publicly identify details of the Loan in Romspen's advertising and public communications of all kinds, including, but not limited to, press releases, direct mail, newspapers, magazines, journals, e-mail, or internet advertising or communications. Such details may include the name of the Property, the address of the Property, the amount of the Loan, the date of the closing and a description of the size/location of the Property.

11.15    **Signage**. Subject to all Legal Requirements, Lender shall be entitled to place on the Property signage indicating Lender's participation in the funding of the Property.

11.16    **Currency; Currency Adjustment**.  All monetary amounts in this Agreement are expressed in U.S. dollars.

11.17    **Credit Authorization and Consent to Disclosure**. Lender may collect, retain, release, disclose, exchange, share, transfer and assign from time to time, as it may determine in its sole discretion, all information and materials (including financial statements and information concerning the status of the Loan, such as existing or potential Loan defaults, lease defaults or other facts or circumstances which might affect the performance of the Loan) provided to or obtained by it relating to Borrower, Property or the Loan (both before and after the disbursement of funds and/or default thereunder) without restriction and without notice to or the consent of Borrower and/or any guarantor (and each Borrower hereby irrevocably consents thereto):

11.17.1  to any other Lender or investor who has an interest in the Loan;

11.17.2  to any proposed purchaser or subsequent owner of the Loan including any subsequent or proposed Lender and their respective third party advisors and agents, such as lawyers, accountants, auditors, consultants, appraisers and credit verification sources;

11.17.3  to the public or any private group in any offering memorandum, prospectus or other disclosure document relating to any sale, syndication or securitization of the Loan (including all initial and continuing disclosure requirements), regardless of format or scope of distribution;

11.17.4  to the public or other interested persons, directly or indirectly through information service providers or other market participants, for the purpose of providing market information from time to time relating to the status of the Loan or any related securitization or any interest therein, regardless of format or scope of distribution;

11.17.5  to any governmental authority having jurisdiction over any sale, syndication or securitization of the Loan or any trade of any interest therein;

24

11.17.6  to any other Person in connection with the sale, syndication or securitization of the Loan, including insurers and rating agencies; and

11.17.7  to any other Person in connection with the collection or enforcement proceedings taken under or in respect of the Loan.

Without limiting the foregoing, Borrower hereby consents to the Lender obtaining all information as may be necessary from all available sources as to the creditworthiness of Borrower and acknowledges that the Lender may collect or come into possession of personal information relating to certain individuals either comprising or otherwise connected with Borrower which information may include contact information (mailing address, e-mail address, telephone number or fax number), financial information and status (bank account numbers, existing debts, personal net worth or credit history), date of birth, place of employment and social security number. Borrower acknowledges and agrees that such personal information may be used by Lender in connection with the processing, approving, funding, servicing and administering the Loan and any sale, syndication or securitization of the Loan, and in so doing the Lender may disclose and otherwise deal with personal information in the same manner and to the same Persons as provided in the preceding paragraph without restriction and without notice to or the consent of Borrower or any related individual. Borrower for itself and on behalf of its directors, officers, shareholders and principals, hereby consents to and authorizes such use and disclosure of all such personal information by the Lender and represents and warrants that it has full power and authority to give such consent and authorization.

11.18   **Prior Agreements**. This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, including any term sheets, discussion outlines or commitment letters (as same may be amended) between any of the Borrower and Lender are superseded by the terms of this Agreement and the other Loan Documents. In the event of any conflict between the terms of this Agreement and the loan term sheet, the terms of this Agreement shall govern.

11.19   **Register**.  Lender, acting solely for this purpose as an agent of Borrower, shall maintain at one of its offices a register for the recordation of the names and addresses of each Lender, and principal amounts (and stated interest) of the Loan or other Obligations owing to such Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and Borrower and Lender shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

11.20   **Governing Law; Jurisdiction; Etc**.

11.20.1  **Governing Law**. The laws of the State of Nevada will govern this Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby and thereby.

11.20.2  **Submission to Jurisdiction**. Borrower irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise, against Lender in any way relating to this Agreement or the transactions contemplated hereby, in any forum other than the courts of the State of  Nevada sitting in Washoe County, and of the United States District Court of the District of Nevada, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that any such action, litigation or proceeding may be brought in any such Nevada State court or, to the fullest extent permitted by applicable law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action, litigation or

proceeding will be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing herein will affect any right that Lender may otherwise have to bring any action or proceeding relating to this Agreement against Borrower or its properties in the courts of any jurisdiction.

11.20.3 **Waiver of Venue**. Borrower irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in any such court referred to in Section 11.20.2. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

11.20.4 **Service of Process**. Borrower irrevocably consents to the service of process in the manner provided for notices in Section 11.1 and agrees that nothing herein will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

11.21 **Waiver of Jury Trial**. BORROWER AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON THE LOAN EVIDENCED BY THIS AGREEMENT OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR ANY OF THE LOAN DOCUMENTS OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF BORROWER OR LENDER. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER'S MAKING OF THE LOAN.

11.22 **Interpretation**. For purposes of this Agreement and the other Loan Documents, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole; (d) the term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form; and (e) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including", the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including". The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. Unless the context otherwise requires, references herein (x) to articles, sections, and exhibits mean the articles and sections of, and exhibits attached to, this Agreement; (y) to an agreement, instrument or other document mean such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute mean such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. Any exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable). When payment or performance of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day that is not a Business Day or Banking Day, the date of such payment or performance shall extend to the immediately succeeding Business Day or Banking Day. Any reference to officers, shareholders, stock, shares, directors, boards of directors, corporate authority, articles of incorporation, bylaws or any other such references to matters relating to a corporation made herein or in any other Loan Document with respect to a Person that is not a corporation shall mean and be references to the comparable terms used with respect to such Person.

11.23    **Brokers and Financial Advisors.**  Borrower hereby represents that, except for JLL Capital Markets ("**Broker**"), it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement.  Borrower shall indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person (including Broker) that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein.  The provisions of this <u>Section 11.23</u> shall survive the expiration and termination of this Agreement and the payment of the Obligations.  For the avoidance of doubt, the indemnity set forth in this <u>Section 11.23</u> shall inure to the benefit of each Lender that has held an interest in the Loan at any time, including the initial named Lender hereunder.

11.24    **Lender Split and Severance of Loan; Loan Sale and Participation**.  Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, security instruments and other security documents (the "**Severed Loan Documents**") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder. Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until three (3) days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power.  Lender further has the right (i) to sell or otherwise transfer the Loan (or any portion thereof and/or interest therein), (ii) to sell participation interests in the Loan (or any portion thereof and/or interest therein) or (iii) to securitize the Loan (or any portion thereof and/or interest therein) in a single asset securitization or a pooled asset securitization.

11.25    **Confidentiality**.  The Borrower and Guarantor acknowledge and agree that the terms and conditions recited herein are confidential between the Borrower, the Guarantor and the Lender. The Borrower and Guarantor agree not to disclose the information contained herein to a third party without the express written consent of the Lender, provided however that Borrower shall have the right to disclose the essential terms of the Loan Documents in its financial statements and/or in material presented to investors.

11.26    **Commitment Survival.** The terms of the loan commitment letter shall survive the execution of this Agreement, and shall be binding upon Borrower and Lender until payment in full of the Loan. If any provision of the loan commitment letter shall conflict with the terms in this Agreement, this Agreement shall control.

12.    **State-Specific Provisions**.

12.1    **Principles of Construction**. In the event of any inconsistencies between the terms and conditions of this Section and the other terms and conditions of this Agreement, the terms and conditions of this Section shall control and be binding.

12.2    **Additional Events of Default**. Borrower shall be in default on this Loan if Borrower sends a notice pursuant to NRS Section 106.380(1), as amended or recodified from time to time, with respect to the Security Instrument; (i) delivers, sends by mail or otherwise gives, or purports to deliver, send by mail or otherwise give to Lender:  (A) any notice of an election to terminate the operation of the Security Instrument as security for any Obligations, including, without limitation, any obligation to repay any "future advance" (as defined in NRS Section 106.320, as amended or recodified from time to time) of "principal" (as defined in NRS Section 106.345, as amended or recodified from time to time), or (B) any other notice pursuant to NRS Section 106.380(3), as amended or recodified from time to time, (ii) records a statement pursuant to NRS Section

27

106.380(3), as amended or recodified from time to time, or (iii) causes the Security Instrument, any Obligations, or Lender to be subject to NRS Sections 106.380(2), 106.380(3) or 106.400, as amended or recodified from time to time.

12.3     **One Action Rule Waiver**.  To the fullest extent permitted under applicable law, Borrower expressly waives the benefits and provisions afforded under any "one action" or "anti-deficiency" law, including, without limitation, the benefits and provisions of NRS 40.430.

[signature page to follow]

Borrower and Lender have executed this Agreement to be effective as of the date stated in the introductory clause.

BORROWER

LATIGO RENO, LLC,
a Delaware limited liability company

By: _____

Print Name: Mark S. Maron
Title: Authorized Representative

Address:

Latigo Reno, LLC
11845 West Olympic Blvd., Suite 515W
Los Angeles, CA 90064
Attn: Mark S. Maron

With a copy to:

Faegre Drinker Biddle & Reath LLP
105 College Road East, P.O. Box 627
Princeton, New Jersey 08542
Attn: Dorothy E. Bolinsky

Signature Page to Real Estate Loan Agreement

29

Borrower and Lender have executed this Agreement to be effective as of the date stated in the introductory clause.

LENDER

TIG ROMSPEN US MASTER MORTGAGE LP,
an exempted Cayman Islands limited partnership

By:  Romspen US Master Mortgage GP LLC
Its:  General Partner

    By:  Romspen US Mortgage GP Inc.
    Its:  General partner of its sole member

    By:_____
    Print Name:_____Joel Mickelson_____
    Title: Authorized Signing Officer

Address:

162 Cumberland Street, Suite 300
Toronto, Ontario M5R 3N5
Attention: Wesley Roitman
Telephone: (416) 966-1100
Facsimile: (416) 966-1161
E-Mail: wes@romspen.com

Signature Page to Real Estate Loan Agreement

30

SCHEDULE I
Definitions

"**Acceptable Appraisal**" means an appraisal, conducted by an appraiser acceptable to Lender, which appraisal must be in form and substance acceptable to Lender, and shall meet Lender's minimum appraisal standards.

"**Affiliate**" or "**Affiliates**" means any Person controlled by, controlling or under common control with Person, including any subsidiary of such Person. For purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"**Approved Accounting Method**" means generally accepted accounting principles in the United States of America as of the date of the applicable financial report ("**GAAP**"), federal tax basis accounting (consistently applied) or such other method of accounting, consistently applied, as may be reasonably acceptable to Lender.

"**Assignment of Agreements**" shall mean, with respect to the Property, that certain first priority Assignment of Plans, Specifications, Contracts, Licenses and Permits dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender, subject to the terms thereof, all of Borrower's interest in and to contracts, Licenses, permits and approvals necessary for the use, operation, development, renovation, and construction of the Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Escrow**" means that certain Collateral Assignment of Escrow Proceeds by Borrower in favor of Lender and acknowledged by the escrow agent thereunder relating to the earnest money deposit under the Greystar Contract and held pursuant to the terms of the Greystar Contract.

"**Assignment of PSA**" means a collateral assignment of the Greystar Contract, in a form and substance reasonably acceptable to Lender and Greystar, made by Borrower in favor of Lender and acknowledged by Greystar.

"**Banking Day**" shall mean a day on which the Toronto, Ontario, head office for the Royal Bank of Canada is open for business and which is not a Saturday, Sunday, civic or statutory holiday in Canada.

"**Building Permit Application**" means that certain building permit application with a number of (BLD22-0544E) filed by Borrower with the City with respect to the development and construction of the Project on the Property.

"**Business Day**" shall mean a day on which commercial banks are not authorized or not required by law to close in the State of New York or in the State where the Property is located.

"**Casualty**" means the occurrence of any casualty, damage, or injury, by fire, explosion, accident, flood, storm, earthquake, act of God or otherwise, to the Property.

"**City**" means the City of Reno, NV.

"**Collateral**" means all personal property and real property subject to the lien of the Security Instrument or any other Loan Document, whether now owned or existing or hereafter acquired or arising or in which Borrower now has or hereafter acquires any rights.

"**Condemnation**" means any temporary or permanent taking by a governmental authority as the result, in lieu, or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property or any interest or right therein, including any right of access or change of grade affecting the Property.

Schedule I - 1

31

"**Conditional Earnout Advance Amount**" means a portion of the Loan Amount equal to $1,000,000.

"**Control**" or "**Controls**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"**Default Period**" means the period of time commencing on the day an Event of Default occurs and continuing through the date the Event of Default has been cured or waived.

"**Design and Entitlement Professional**" means each architect, engineer, entitlement consultant and or other party providing design, engineer or entitlement work for the Project.

"**Design/Entitlement Contract**" means the each contract between a Design and Entitlement for preparation of the Plans and Specifications, or any other contract provisioning engineering, site work, design or entitlement work for the Project.

"**Development Conditions**" means all conditions set forth in (a) the Building Permit Application and (b) any other resolution, condition or requirement of the City or any other governmental authority in connection with the construction of the Project.

"**Disbursement Request**" means a written request submitted on Lender's standard form of disbursement request.

"**Entitlement Milestones**" means the entitlement and development milestones set out in Exhibit A.

"**Environmental Laws**" means and includes all federal, state and local laws including statutes, regulations, ordinances and other governmental restrictions and requirements and common law relating to the presence, discharge or remediation of air pollutants, water pollutants or process wastewater or otherwise relating to the protection of human health, the environment, toxic or hazardous substances, pesticides, herbicides, fertilizer, mold, asbestos or radon, including the Federal Solid Waste Disposal Act, the Federal Clean Air Act, the Federal Clean Water Act, the Federal Resource Conservation and Recovery Act, the Toxic Substances Control Act, the Federal Insecticide, Fungicide and Rodenticide Act, the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Federal Water Pollution Control Act, the Federal Occupational Safety and Health Act, the Federal Emergency Planning and Community Right to Know Act, the Federal Mine Safety Act, the Federal Safe Drinking Water Act, regulations of the Environmental Protection Agency, Nuclear Regulatory Agency and any other federal agency, and all other regulations of any State department of natural resources or State environmental protection agency now or at any time hereafter in effect.

"**Extension Period Debt Service Reserve Account**" means an account held by Lender, or Lender's designee, in which the Extension Period Debt Service Reserve Deposit will be held, which shall not constitute a trust fund.

"**Extension Period Debt Service Reserve Deposit**" has the meaning set forth in Section 4.2.2 of this Agreement.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"**Greystar**" means Greystar Development West, LLC, a Delaware limited liability company.

Schedule I - 2

"**Greystar Contract**" means that certain Agreement for Purchase and Sale of Real Property dated January 19, 2022, by and between Borrower, as seller, and Greystar, as buyer, as amended.

"**Greystar EMD Vesting Date**" means the date upon which the earnest money deposit under the Greystar Contract has become "hard" and is unconditional and non-refundable to Greystar, as buyer, pursuant to the terms of the Greystar Contract unless and except as a result of a default of the Borrower under the Greystar Contract.

"**Guarantor**" means MARK S. MARON, an individual, and MARK S. MARON and SUSAN L. MARON, as Trustees of THE MARON LIVING TRUST under agreement dated October 6, 2001 and ROBERT DALY, JR., an individual, and each other party that may now or hereafter guaranty the Obligations.

"**Guaranty**" means each guaranty executed by a Guarantor.

"**Interest Advance Milestone Date**" shall be deemed satisfied upon the occurrence of the Greystar EMD Vesting Date, as determined by Lender in its reasonable discretion.

"**Leases**" means any and all leases, subleases, licenses, concessions, rental agreements or other agreements (written or oral, now or hereafter in effect) that grant a possessory interest in and to, or the right to use or enjoy, all or any part of the Property (including all or a portion of the oil, gas or other minerals located underneath the Property).

"**Legal Requirements**" means all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees, demands and injunctions of governmental authorities affecting the Loan, Borrower, any Guarantor or the Property or any part thereof or the ownership, construction, alteration, use, management or operation of the Property or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Securities Act of 1933, as amended, the Securities and Exchange Act of 1934, as amended, Regulation AB, the Dodd-Frank Wall Street Reform and Consumer Protection Act, zoning and land use laws and the Americans with Disabilities Act of 1990, the rules and regulations promulgated pursuant to any of the foregoing, and all permits, licenses and authorizations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting Borrower, any Guarantor or the Property or any part thereof, including, without limitation, any that may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"**Loan**" means the loan made under this Agreement.

"**Loan Amount**" means $12,200,000.

"**Loan Documents**" means this Agreement, the Note, the Security Instrument, each Pledge Agreement, each Guaranty, each Security Agreement, the Assignment of Agreements, the Environmental Indemnity Agreement executed by Borrower and each Guarantor, the Assignment of Escrow, the Assignment of PSA and every other agreement, note, document, contract or instrument to which the Borrower or any Guarantor now or in the future may be a party and that is required by the Lender.

"**Loan-to-Cost Ratio**" means the ratio of (a) the Outstanding Principal Balance of the Loan, to (b) the costs of acquiring and developing the Property, as determined by Lender based on an Acceptable Appraisal, which determination shall be conclusive and binding absent manifest error.

"**Loan-to-Value Ratio**" means a ratio of (a) the Outstanding Principal Balance of the Loan, to (b) the market value of the Property, as determined by Lender based on an Acceptable Appraisal, which determination shall be conclusive and binding absent manifest error.

Schedule I - 3

"**Negative Entitlement Event**" shall be deemed to have occurred upon the occurrence of any of the following: (a) the Building Permit Application is withdrawn, expires, terminates or otherwise ceases to be active, (b) the Project is unable to be constructed under the Mixed Use - University of Nevada Regional Center- Academics and Research zoning designation under the City zoning code, (c) any event, occurrence or action that prevents, prohibits or otherwise limits the construction by any then owner of the Property of a 6 story student housing complex on the Property with not less than (i) 549,832 square feet of building square footage and (ii) 268 student housing rental units containing 901 beds, in each case as a matter of right and without further zoning approval or (d) the failure of the Building Permit Application, and any related building permit issued in connection therewith, to transfer to any subsequent owner of the Property.

"**Purchase Agreement**" shall mean any bona fide purchase agreement, contract of sale, or similar agreement in form and substance satisfactory to Lender, pursuant to which Borrower proposes to sell the Property to a third party arms-length purchaser, together with all amendments, modifications, or supplements thereto and any other agreements between the purchaser thereunder and any of the Borrower or their Affiliates related thereto.

"**Material Adverse Change**" shall mean a material adverse change in (i) the assets, operations, or financial condition of Borrower or the Person in question, (ii) the ability to pay the Obligations of Borrower or the Person in question in accordance with the terms hereof and otherwise comply with the terms of this Agreement and the Loan Documents, (iii) the Property or the value thereof, (iv) the validity, priority or enforceability of this Agreement or any other Loan Document, (v) the ability of Lender to enforce its rights and remedies pursuant to this Agreement or any other Loan Documents, (vi) Lender's lien on the Property or the first priority of such lien, or (vii) the Loan.

"**Maturity Date**" means the first to occur of (a) November 30, 2022 or May 31, 2023 if the extension conditions in Section 2.3 have been satisfied or (b) the date of acceleration of the Loan pursuant to this Agreement.

"**Monthly Payment Date**" means the first (1st) day of each month.

"**Obligations**" is used in its most comprehensive sense and means any debts, obligations and liabilities of Borrower to Lender, whether incurred in the past, present or future, whether voluntary or involuntary, and however arising, and whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and including all obligations arising under any interest rate swap, interest rate collar, derivative, foreign exchange, deposit, treasury management or similar transaction or arrangement however described or defined that Borrower may enter into at any time with Lender, whether or not Borrower may be liable individually or jointly with others, or whether recovery upon such Obligations may subsequently become unenforceable.

"**Outstanding Principal Balance**" means, as of any date, the outstanding principal balance of the Loan.

"**Patriot Act**" means the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001), as amended.

"**Permitted Liens**" means (a) those liens and encumbrances set forth on schedule B-II to the Title Policy or (b) as approved by Lender in its discretion in writing.

"**Permitted Transfers**" transfers of indirect, beneficial (but not direct) equity interests in Borrower which (i) in the aggregate over the term of the Loan do not exceed twenty percent (20.00%) of the total interests in Borrower, (ii) do not result in a change of Control and (iii) as to and proposed Transfer where any party which owns or will own after such Transfer a 10% or greater direct or indirect equity ownership interests, such Transfer shall be conditioned upon delivery to Lender of Satisfactory Search Results.

Schedule I - 4

"**Person**" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision of a governmental entity.

"**Plans and Specifications**" means the detailed plans and specifications and/or project manual for the construction of the Project, which are prepared in accordance with the terms of a Design/Entitlement Contract, including any shop or field drawings made in furtherance thereof, together with any changes made therein which are permitted under the terms of this Agreement.

"**Pledge Agreement**" shall mean that certain Membership Interests Pledge Agreement dated of even date herewith between each member of Borrower and Lender, with respect to limited liability company interests in Borrower.

"**Project**" means the development of the Property and construction of a 6 story student-housing complex on the Property with not less than (i) 549,832 square feet of building square footage and (ii) 268 student housing rental units containing 901 beds.

"**Property**" means the real property described in the Security Instrument and all improvements located thereon.

"**Property Manager**" means Borrower and each other party that may now or hereafter manage the Property.

"**Rents**" has the meaning set forth in the Security Instrument.

"**Rent Roll**" means a written statement from Borrower, detailing the names of all tenants of the Property, the portion of Property occupied by each tenant, the base rent and any other charges payable under each lease, the term of each lease, the beginning date and expiration date of each lease, whether any tenant is in default under its lease (and detailing the nature of such default), and any other information as is reasonably required by Lender, all certified to be true, correct and complete.

"**Satisfactory Search Results**" means credit searches and other know your customer type searches each in form, scope and substance and from a provider, in each case, reasonably acceptable to Lender.

"**Security Agreement**" shall mean each first priority security agreement from Borrower to Lender dated as of the date hereof, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Security Instrument**" means that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing executed by Borrower, pursuant to which Borrower grants Lender a security interest in its real and personal property to secure payment and performance of the Obligations.

"**Sources and Uses of Funds**" shall mean the Sources and Uses of Funds delivered to Lender in connection with the Loan and attached hereto as Schedule II.

"**Taxes**" means all real estate taxes, government assessments or impositions, lienable water charges, lienable sewer rents, assessments due under owner association documents, ground rents, vault charges and license fees for the use of vault chutes and all other charges, now or hereafter levied or assessed against the Property.

"**Title Insurance Company**" means Ticor Title of Nevada, Inc.

"**Transfer**" means any action by which either (a) the legal or beneficial ownership of the equity interests in Borrower which is not a Permitted Transfer, or (b) the legal or equitable title to the Property, or any part thereof, or (c) the cash flow from the Property or any portion thereof, are sold, assigned, transferred,

Schedule I - 5

35

hypothecated, pledged or otherwise encumbered or disposed of, in each case (a), (b) or (c) whether undertaken, directly or indirectly, or occurring by operation of law or otherwise.

Schedule I - 6

## SCHEDULE II

### Sources and Uses of Funds

**Initial Advance:**

| | |
|---|---:|
| To purchase certain parcels of the Property | $7,577,381 |
| To repay existing financing on the Property | $2,700,000 |
| Payment of fees owed to Lender | $224,000 |
| Payment of fees owed to Broker | $112,000 |
| Payment of title insurance and escrow costs and other fees and costs | $42,595 |
| **Total for Initial Advance:** | $10,655,976 |

**Subsequent Advances**:

| | |
|---|---:|
| To make Interest Reserve Advances to pay interest on the Loan from and after satisfaction of the Interest Advance Milestone Date | $544,024 |
| **Total for Subsequent Advances:** | **$544,024** |

**Subsequent Conditional Earnout Advance Amount Advances (only to the extent and upon satisfaction of the conditions set forth in Section 5.4):**

| | |
|---|---:|
| To pay the Conditional Earnout Advance Amount to Borrower | $1,000,000 |
| **Total for Subsequent Conditional Earnout Advance Amounts Advances:** | **$1,000,000** |

Schedule I - 1

SCHEDULE III

Minimum Insurance Requirements

The Borrower shall obtain and maintain during the term of the Loan the following insurance coverage with respect to the Property and the property related thereto or used for its operation.

1.    Existing Properties

    1.1    **Fire Insurance**:  [Reserved ]

    1.2    **Boiler and Machinery Insurance**:  [Reserved ]

    1.3    **Liability Insurance**:   A general liability insurance policy covering corporeal and material damages in an amount of not less than Five Million Dollars ($5,000,000) per occurrence.  The policy shall include limited pollution coverage.

    1.4    **Rental Insurance**: [Reserved ]

2    For Properties Under Construction

    2.1    All Risks Builders Course of Construction:

    All Risks Builders Course of Construction including flood and earthquake on:

    (i)    one hundred percent (100%) of the estimated final construction cost of the Property, including reasonable soft costs;

    (ii)    one hundred percent (100%) of the anticipated annual rents (assuming full occupancy) written on a delayed income basis.

    The policy shall allow for partial or full occupancy.

    All other terms and conditions shall apply as if there were a fire with extended coverage policy in force as described above in paragraph 1.1.

    2.2    The liability coverage as described more fully in paragraph 1.3 above.  However, if the construction cost is in excess of Ten Million Dollars ($10,000,000), then a Wrap-up Liability is required with a limit of not less than Ten Million Dollars ($10,000,000) and must include all contractors, subcontractors and trades.

    2.3    Engineers' errors and omission insurance for at least Five Hundred Thousand Dollars ($500,000) or such greater amount as Lender may reasonably require.

3.    Additional Insurance

    In addition to any of the forgoing, the Lender shall be entitled to request that the Borrower obtain any other insurance coverage it deems necessary, useful or appropriate.

Schedule I - 2

The provisions relating to cancellation of the insurance policies or alteration clauses in the policies, including the mortgage clause, shall provide that a prior written notice of not less than thirty (30) days must in such event be given to the Lender.

All proceeds of insurance from insurance policies maintained other than liability insurance, shall be paid to the Lender and at the option of the Lender may either be applied on account of the Loan, whether or not the same may be due and payable, and interest thereon and any other sums payable in respect thereof, or held by it as part of the Lender's security and, so long as the Borrower is not in default, may be subject to withdrawal by the Borrower in instalments on a cost to complete basis, as the repair or replacement progresses, subject to the Lender's receipt of appropriate certificates, opinions and other documents as required by it and Lender's counsel.

The Borrower shall provide to the Lender such evidence as the Lender may request that all of the above required insurance is in place prior to any advance of the Loan being made.

All required insurance policies shall be forwarded to the Lender's insurance expert at the following address for verification and approval, at the expense of the Borrower, prior to the disbursement of the first advance of the Loan and, in addition, if permanent financing is being provided hereunder, at the time of substantial completion of the Property.

Schedule I - 3

39

**EXHIBIT A**

Entitlement Milestones

(Attached)



Schedule I - 1

41